**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-11-02275-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Noe Abrego, | |
| Defendant. | |

Plaintiff United States has filed a Motion for an Order permitting involuntary medication of Defendant Noe Abrego to restore him to competency to stand trial. (Doc. 71.) The Motion is granted for the reasons described below.

## BACKGROUND

Abrego was allegedly intercepted near San Luis, Arizona, at the U.S.-Mexico border on September 26, 2011, after having been deported on September 7, 2011. The grand jury charged Abrego with violations of 8 U.S.C. § 1326(a) and (b)(1). (Doc. 20.) On May 31, 2012, this Court found Abrego incompetent to stand trial and ordered that he be committed to the custody of the Attorney General for hospitalization and psychiatric treatment pursuant to 18 U.S.C. § 4241(d). (Doc. 51.) He was transferred to the Federal Medical Center in Butner, North Carolina ("FMC-Butner") in July of 2012.

The FMC-Butner staff diagnosed Abrego with schizoaffective disorder of a bipolar type, antisocial personality disorder, and gastroesophageal reflux disease. (Hr'g Ex. 4 at 9.) They also determined that Abrego was incompetent to stand trial. (*Id.* at 11.) The FMC-Butner staff encouraged Abrego to take psychotropic medication, but he

repeatedly refused to do so, largely because he did not think he was incompetent. In a written report (the "FMC-Butner Evaluation"), the treating doctors requested a judicial order authorizing them to forcibly medicate Abrego for the sole purpose of restoring him to competency for trial. The evaluators recognized that their request was subject to the requirements set forth in *Sell v. United States*, 539 U.S. 166 (2003). The FMC-Butner Evaluation set forth the doctors' reasons for concluding that the *Sell* requirements were satisfied. The government subsequently filed this Motion on December 28, 2012. (Doc. 71.)

The Court held a *Sell* hearing on January 30, 2013. The two co-authors of the FMC-Butner Evaluation—Drs. Angela Walden Weaver and Robert Lucking—testified for the government. The defense presented no evidence.

**DISCUSSION**

**I. LEGAL STANDARD**

In "rare" instances, "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial." *Sell*, 539 U.S. at 179. Four factors inform that determination, and the government must present clear and convincing evidence to satisfy each factor. *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010). First, "a court must find that important governmental interests are at stake." *Sell*, 539 U.S. at 180. Second, "the court must conclude that involuntary medication will significantly further those concomitant state interests." *Id.* at 181. Third, "the court must conclude that involuntary medication is necessary to further those interests." *Id.* And fourth, "the court must conclude that administration of the drugs is medically appropriate." *Id.*

**II. ANALYSIS**

The Supreme Court has reaffirmed on several occasions a "liberty interest in freedom from unwanted anti-psychotic drugs." *Riggins v. Nevada*, 504 U.S. 127, 137 (1992); *see also Washington v. Harper*, 494 U.S. 210, 221-22 (1990); *Sell*, 539 U.S. at

- 2 -

178. An order requiring involuntary medication of a prisoner is therefore "disfavored", *Rivera-Buerrero*, 429 F.3d at 1137, and requires "thorough consideration and justification" and "especially careful scrutiny", *United States v. Williams*, 356 F.3d 1045, 1055 (9th Cir. 2004). "The Supreme Court clearly intends courts to explore other procedures, such as *Harper* hearings (which are to be employed in the case of dangerousness) before considering involuntary medication orders under *Sell*." *Rivera-Guerrero*, 426 F.3d at 1137. Only in "highly-specific factual and medical circumstances" should a district court issue a *Sell* order. *Id.* at 1136. The government, however, has expressly disclaimed reliance on *Harper*. The government has asserted that, at least so far, Abrego has not exhibited the requisite showing of dangerousness to proceed under *Harper*.

### A. Important Government Interest

Abrego is charged with illegal reentry in violation of 8 U.S.C. § 1326. (Doc. 20.) The run-of-the-mill illegal reentry case does not fit the paradigm of a "serious" crime. *See Sell*, 539 U.S. at 180 ("The Government's interest in bringing to trial an individual accused of a *serious* crime is important." (emphasis added)). Nevertheless, "at least under some circumstances, a violation of § 1326 may constitute a 'serious' crime sufficient to justify involuntary medication under *Sell*." *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008); *see also River-Guerrero*, 426 F.3d at 706 n.5. A rough approximation of the crime's "seriousness" is the sentencing guideline range applicable to the defendant. *Hernandez-Vasquez*, 513 F.3d at 919 ("Although the sentencing guidelines no longer are mandatory, they are the best available predictor of the length of a defendant's incarceration.").

Applying the *Hernandez-Vasquez* framework, the guideline range applicable to Abrego based on the pretrial services report is 92-115 months. (Docs. 4, 71.) This relatively lengthy sentence would stem from Abrego's extensive criminal history, which includes convictions for possession and purchase of controlled substances, possession of controlled substances while armed, and felony possession of a firearm. (Doc. 4.) These

are serious violations, and the presence of weapons in at least two of them amplifies that seriousness. Keeping in mind that Abrego has been in the government's charge for approximately 16 months, Abrego remains subject to an additional 76-99 months in custody. That history and guideline range is similar to the adjusted 53-78 month range in *Ruiz-Gaxiola*, which was sufficient to support an important government interest. 623 F.3d at 694-95. Moreover, Abrego tried to reenter the U.S. a mere three weeks after his removal. The proximity of offenses is also a factor relevant to the determination of whether the government has an important interest in bringing the defendant to trial. *Id.* at 694.

Whether the defendant faces a risk of civil confinement if released is also a factor in determining the importance of the government interest. *Id.* at 693-94. This is because civil confinement "would 'diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime,' and thereby lessen the need for prosecution." *Id.* at 693 (quoting *Sell*, 539 U.S. at 180). There is no indication in the record before the Court that Abrego would face civil confinement if released; indeed, he would likely be deported.

The Court notes that these are atypical facts for a § 1326 proceeding. The typical illegal reentry case would be an unlikely candidate for an "important interest." Nevertheless, the unique confluence of factors in this case leads the Court to conclude that the government has established an important interest by clear and convincing evidence in bringing Abrego to trial.

### B. Further the State Interests

Involuntary medication must further two important state interests. The administration of the drugs must be "substantially likely to render the defendant competent to stand trial", while at the same time making it "substantially unlikely [for the defendant] to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Sell*, 539 U.S. at 181. The Ninth Circuit has required district courts "to make factual findings so that the defendant may be assured

that the trial court has conducted the stringent review mandated in light of the substantial infringement on his liberty interests, and so that upon review the appellate court may determine whether the findings are supported by clear and convincing evidence." *Ruiz-Gaxiola*, 623 F.3d at 696.

The Court has reviewed the evidence produced by the government doctors.[1] Their joint opinion is that antipsychotic medication is substantially likely to render Abrego competent to stand trial. (Hr'g Ex. 4 at 18.) They seek to administer a medication known as Risperidone, a "second generation antipsychotic." (*Id.* at 23.) Central to the doctors' conclusion was the fact that Abrego was previously found incompetent to stand trial but was restored to competency through involuntary medication with antipsychotics for a period of several months in late 2010 through early 2011. (*Id.* at 19; Doc. 4 at 3.) There is thus direct evidence of the effectiveness of antipsychotics in treating Abrego's mental illnesses. This stands in contrast to Ninth Circuit's decision to reverse in *Ruiz-Gaxiola*, where the lower court lacked evidence that the defendant had responded favorably to antipsychotics. 623 F.3d at 699.

As defense counsel pointed out at the hearing, however, the previous involuntary medication of Abrego involved a different antipsychotic. He was treated with a variety of "first generation" antipsychotics, including Zyprexa and Haldol. (Hr'g Ex. 4 at 3-4.) Abrego thus contends that his previous treatment does not inform whether the current suggested treatment would be effective in restoring him to competency. The difference in medication, however, does not disturb the fact that involuntary medication with antipsychotics has been effective with Abrego. The main difference between the first and second generation of drugs appears to be in their side effects, and Dr. Lucking testified that the side effects with the second generation medications (which he seeks to use) are less onerous. (Hr'g Ex. 4 at 22.) Both generations of medication are "equally effective in treating the positive symptoms of schizophrenia. . . ." (*Id.* at 18.) The Court therefore

---

[1] Abrego did not present any testimony.

finds that Abrego's medical history is persuasive on the question of the likely effectiveness of the medication in restoring Abrego to competency.

That conclusion is bolstered by the medical evidence submitted by the government through the FMC-Butner Evaluation filed by Drs. Walden Weaver and Lucking. They point to numerous studies that show that individuals with active psychotic illness can be restored to competency through involuntary medication with antipsychotics. (*Id.* at 20-22.) Moreover, Risperidone's stated effect is to reduce the very symptoms that currently render Abrego incompetent to stand trial. (*Id.* at 18-19.) Dr. Walden Weaver testified that she or a member of her staff had been in contact with Abrego on a regular basis, and thus her opinion on the likely effectiveness of medication receives great weight. Thus the Court concludes that involuntary medication is substantially likely to restore Abrego to competence.

With regard to side effects, the evidence is that they are unlikely to affect Abrego at trial. Like all antipsychotics, the second-generation medications do have some side effects. Those side effects, however, would most likely be metabolic, not neurological. (*Id.* at 16-17.) Metabolic side effects are unlikely to render Abrego unable to stand trial. Furthermore, Abrego does not have any underlying brain disease or other condition that would be exacerbated by administration of the medication. (*Id.* at 21.) Nor is sedation a probable side effect. (*Id.*) The Court therefore concludes that it is substantially unlikely that Abrego will experience side effects that will interfere significantly with his ability to assist counsel in conducting a trial defense.

### C. Necessity

For involuntary medication to be in order, "any alternative, less intrusive treatments [must be] unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181. That is the case here. Abrego does not believe that he has a mental illness and therefore does not believe that he needs treatment. (Hr'g Ex. 4 at 21.) In fact, he has continually refused any treatment for his mental illness. These are facts that tend to establish this third prong of the *Sell* inquiry. *See Ruiz-Gaxiola*, 623 F.3d at 703 (noting

defendant's "resistance to treatment and his conspiratorial delusions[ ] made it unlikely that he would engage in . . . voluntary therapy"). Abrego is also unable to engage with others and therefore psychotherapy would likely be ineffective. (Hr'g Ex. 4 at 21.) Even if he could, the doctors assert that "[t]here is no evidence that psychotherapeutic techniques alone are effective alternatives for antipsychotic agents." (*Id.*) The doctors predict that it will require at least 120 days to restore Abrego to competency, the allowable time under 18 U.S.C. § 4241(d). The Court therefore concludes that any alternative, less intrusive treatments would be unlikely to achieve substantially the same results with Abrego.

### D. Medical Appropriateness

The government must finally show that "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181. "[T]he scope of the inquiry with respect to the fourth *Sell* factor is far broader than with respect to the second *Sell* factor. . . . [T]he fourth Sell factor requires the court to consider all of the medical consequences of the proposed involuntary medication, including those consequences that may not affect the defendant's trial in any way, but result in long term side effects." *Ruiz-Gaxiola*, 623 F.3d at 704. For example, "it is not medically appropriate to reduce [the defendant's] delusions by involuntary medication for the period of the criminal trial if the delusions will resume upon its completion and, due to the medication, cause him to experience long-term side effects." *Id.* at 705.

Abrego suffers from a range of mental illnesses. Treatment of those illnesses is in his best medical interest. Up until this point, Abrego has refused treatment, which has resulted in a lack of improvement in his mental condition. He continues to exhibit delusion and a general lack of knowledge regarding his circumstances. (Hr'g Ex. 4 at 6-10.) He cannot carry on conversations with medical staff. (*Id.*) For example, he believes that everyone is involved in a plan to deny him Social Security benefits and that people were sneaking into his room to manipulate his genitals and alter his tattoos. (*Id.* at 6.)

Treatment would mitigate these symptoms. Indeed, he was treated favorably with first generation antipsychotics previously, and there is no evidence that he suffered adverse side effects beyond those exhibited and controlled during treatment. The treatment with the second generation antipsychotics presents a much better scenario. Use of the Risperidone instead of the first generation medication significantly reduces the incidence of neurological side effects, although neurological side effects occur in rare instances. (Hr'g Ex. 4 at 16-17.) The more likely side effects that for Abrego are metabolic, such as weight gain. (*Id.* at 17.) There is also a chance, albeit a small one, of the development of diabetes. (*Id.* at 17-18.) However, all of these potential side effects can be managed with relative ease through both non-medication treatment and medication. (*Id.*)

Abrego contends that there is a potential that he will have long-term side effects after discharge from the institution. He does not cite any medical evidence for that proposition, however. Furthermore, Abrego had been previously medicated with antipsychotics and does not appear to have suffered lasting side effects after restoration to competency. Finally, Abrego will remain in federal custody after his time at FMC-Butner expires, and will be observed there for any residual side effects post-medication.

There is no evidence that Abrego will experience long-term side effects that offset the benefit he would receive from treatment of his mental condition. Both doctors testified that the medication was medically appropriate. They have prescribed a clear, careful regime of medication that includes monitoring for potential side effects, how they will combat those side effects should they arise, and the length of time they anticipate the treatment taking. (*Id.* at 22.) Their report reveals that they are proceeding with caution and sensitivity in this grave matter. *See United States v. Evans*, 427 F. Supp. 2d 696, 704-05 (W.D. Va. 2006). In light of all this, the government has established by clear and convincing evidence that involuntary medication is medically appropriate.

## CONCLUSION

The government has produced clear and convincing evidence to satisfy all four of the *Sell* factors, and that evidence stands unrebutted by Abrego. The Court therefore

orders that involuntary medication of Abrego begin and follow the manner prescribed by Drs. Walden Weaver and Lucking in the FMC-Butner Evaluation at page 22. That report is reproduced here:

> Mr. Abrego will be treated with risperidone Consta within the dosage range of 25 to 50 mg intramuscularly every two weeks due to the report of side effects related to haloperidol. Extrapyramidal side effects, should they arise, will be treated with . . . . benztropine in the dosage range from 0.5 mg to 2.0 mg twice daily. Akathisia, if it develops[,] would be treated with a combination of benztropine (dosage above) and propranolol 20 mg to 60 mg daily or mirtazapine 15 mg to 60 mg. . . . Metabolic side effects, should they arise[,] will be treated by . . . medical management of the specific metabolic side effect. . . .

(Hr'g Ex. 4 at 22.) If any alterations to that plan are necessary, the government shall present a new treatment plan to the Court. If Abrego elects to take the medication voluntarily upon confrontation with this Order, the government may proceed with the treatments described in the FMC-Butner Evaluation that Abrego had previously rejected.

**IT IS THEREFORE ORDERED** that:

1. The government's Motion (Doc. 71) is **GRANTED**.

2. The government shall proceed with the involuntary medication of Abrego in the manner described above.

3. All medical personnel treating Abrego shall request that Abrego voluntarily take medication orally before each and every administration of medication by injection.

4. The government shall give a status report every 30 days until 120 days have expired from the date of this order, pursuant to 18 U.S.C. § 4241(d)(2).

///
///
///
///
///
///

5. If, after the expiry of 120 days, Abrego has not improved as to permit the trial to proceed, the government may file a motion to continue the involuntary medication.

Dated this 13th day of February, 2013.

*G. Murray Snow*
G. Murray Snow
United States District Judge